# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

KRISTAL DARGON,  )
                          )
       Plaintiff,  )
                          )      NO. 3:25-cv-00013
v.  )
                          )      JUDGE RICHARDSON
XTEND HEALTHCARE, LLC, et al.,  )
                          )
       Defendants.  )
                          )

## MEMORANDUM OPINION

Pending before the Court in this putative class action are two motions. The first motion is a motion to dismiss (Doc. No. 27, "Xtend Motion") filed by Defendant Xtend Healthcare, LLC (hereinafter "Defendant Xtend" or "Xtend"). Defendant Xtend has filed a memorandum in support (Doc. No. 28, "Xtend Motion Memorandum") of the Xtend Motion. Plaintiff, Kristal Dargon, has filed a response (Doc. No. 31, "Xtend Motion Response") in opposition to the Xtend Motion. Defendant Xtend has filed a reply (Doc. No. 33, "Xtend Motion Reply") in further support of the Xtend Motion.

The second motion is a motion to dismiss (Doc. No. 34, "Navient Motion," and collectively with the Xtend Motion, "Motions") filed by Defendant Navient Corporation (hereinafter "Defendant Navient" or "Navient," and collectively with Defendant Xtend, "Defendants"). Defendant Navient has filed a memorandum in support (Doc. No. 35, "Navient Motion Memorandum") of the Navient Motion. In the Navient Motion, Defendant Navient indicates that it is incorporating, as support for the Navient Motion, the arguments made in the Xtend Motion Memorandum and also notes that it makes some additional arguments in the Navient Motion

Memorandum. (Doc. No. 34 at 1).[1] Plaintiff has filed a response (Doc. No. 42, "Navient Motion Response") in opposition to the Navient Motion.[2] Defendant Navient did not file a reply.

Via the Motions, Defendants respectively seek dismissal of the claims Plaintiff set forth against them in her "Amended Class Action Complaint" (Doc. No. 21, "Amended Complaint") pursuant to Rule 12(b)(6). For the reasons described herein, the Motions (Doc. Nos. 27, 34) will be **GRANTED**.

ALLEGED FACTS[3]

## 1. Defendants And The Call Center

Xtend "is a Tennessee corporation with a principal place of business at its headquarters located at 90 Volunteer Drive, Suite 150, Hendersonville, Tennessee ("Headquarters")." (Doc. No. 21 at ¶ 19). "Xtend was, until approximately August 13, 2024, and at all times relevant to the acts alleged in this Complaint, a wholly-owned and -controlled subsidiary of Defendant Navient []." (*Id.* at ¶ 20). Navient is "a Delaware corporation . . . that specialized in, *inter alia*, contact center solutions for federal, state and local government agencies." (*Id.* at ¶ 21).

---

[1] The Court accepts that Defendant Navient incorporated the arguments made in the Xtend Motion Memorandum in support of the Navient Motion so that the arguments in the Xtend Motion Memorandum will be applied by the Court to the Navient Motion.

In light of this, below the Court will at times refer to Defendants collectively making an argument in the Xtend Motion Memorandum.

[2] Plaintiff has also filed a notice of supplemental authority (Doc. No. 61), therein informing the Court of the decision of the United States Bankruptcy Court for the Southern District of Texas in *Weatherwax v. Sunnova.*, No. 25-90160, 2026 WL 598476 (Bankr. S.D. Tex. Mar. 3, 2026). The Court discusses this decision below.

[3] The facts herein are taken from the Amended Complaint. For purposes of the instant Motion, the facts in the Amended Complaint are accepted as true, except to the extent that they are qualified herein (as, for example, by "Plaintiff alleges") to denote that they are not being taken as true but instead are set forth merely to make clear what a party claims to be true. Throughout this opinion, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even though it is aware that any such (alleged) fact ultimately might not prove to be true.

In December 2020 "Defendants responded to [the State of] New Jersey's request for a proposal seeking a vendor to operate its COVID-19 vaccination call center, as part of that state's efforts to fight the COVID-19 pandemic." (*Id.* at ¶ 22). "Defendants [then served as] vendors under contract with the State of New Jersey to operate a virtual COVID-19 Vaccination call center (the "Call Center") beginning in spring 2020," (Doc. No. 21 at ¶ 1), and "[t]o operate the Call Center, Defendants employed remote employees," who were tasked with speaking to "New Jersey residents regarding COVID vaccinations." (*Id.* at ¶ 2).[4] Defendants proposed "to provide 1,300 agents to perform Call Center work," (*id.* at ¶ 24) and ultimately employed "hundreds of Call Center employees." (*Id.* at ¶ 5). Defendants "controlled and managed the Call Center from the Headquarters." (*Id.* at ¶ 28). Defendants "managed all the Call Center workers on a daily basis," (*id.* at ¶ 3), and Defendants' "supervisors and managers oversaw the operations of the Call Center,"[5] "direct[ed] employee management, [and] provided services such as project management, quality control, project oversight, IT support, help desk support and performance analysis." (*Id.* at ¶ 31).

The Call Center was operated "on a virtual platform using Navient's call center technology." (*Id.* at ¶ 25). Although virtual, the Call Center, had "all the capabilities of a physical call center." (*Id.* at ¶ 28). The primary goal of employees at the Call Center "was to help New

---

[4] By use of the term "remote employees," the Court discerns that Plaintiff in the Amended Complaint and in her briefing on Motions as well as Defendants in their briefing on the Motions, mean employees who work virtually (i.e., telecommute), and are not required to physically report to a specific location or site for work and do not otherwise *travel for* work.

[5] Although it is unclear from the Amended Complaint as to whether these particular supervisors and managers worked remotely, at least some portion of supervisors and managers, individuals that the Amended Complaint refers to as "lower-level immediate supervisors and managers" worked remotely. (Doc. No. 21 at ¶ 27).

Jersey residents schedule [COVID] vaccination appointments, which agents did, supported by their supervisors." (*Id.* at ¶ 29).

### 2. Plaintiff And Other Employees At The Call Center

Plaintiff is a "resident of the state of New Jersey" (*id.* at ¶ 9) who "was hired by Defendants and worked as a Call Center Supervisor/Operations Manager [from April 5, 2021] until her termination on or about February 24, 2022." (*Id.* at ¶¶ 4, 10). Plaintiff, as well as other similarly situated (putative) class members, "worked remotely . . . for the virtual Call Center." (*Id.* at ¶ 28).

"While working for the Call Center, Plaintiff was directly employed by Xtend," (*id.* at ¶ 11), and "received assignments from and reported to the Call Center's senior management who worked out of" the Headquarters. (*Id.* at ¶ 12). Shortly before Plaintiff's termination, which occurred around February 24, 2022, Plaintiff "was informed during a staff meeting of Call Center workers that the Call Center work would continue another year," (*id.* at ¶ 13), but was then, without advanced written notice, "notified verbally by a manager that she would be terminated effective immediately." (*Id.* at ¶¶ 14-15). Defendants also told other employees for the Call Center that their work "would continue for another year." (*Id.* at ¶ 36). Nevertheless, "hundreds of Call Center employees," (in addition to Plaintiff), were terminated beginning on or about February 24, 2022. (*Id.* at ¶ 38).

PLAINTIFF'S CLAIMS AND DEFENDANTS' MOTIONS

Based on the forgoing Plaintiff brings two claims on behalf of herself and two putative classes.[6]

---

[6] In the Amended Complaint, Plaintiff includes allegations concerning these two putative classes. (Doc. No. 21 at ¶¶ 59-82). For the purposes of the instant motion, these allegations are not relevant, but the Court notes them here for context.

In the Amended Complaint, Plaintiff also includes allegations that she categorizes as "Single Employer Allegations." (Doc. No. 21 at ¶¶ 40-58). Under the WARN Act, if multiple defendants are properly categorized collectively as a "single employer" then these defendants all can be jointly liable for violations

The first claim ("Count I") is for alleged violations of the Worker Adjustment and Retraining Notification ("WARN") Act, 29 U.S.C. § 2104 and is brought on behalf of both Plaintiff and members of a putative class ("WARN Class").[7] With respect to Count I, Plaintiff alleges that, at all relevant times, "Defendants employed more than 100 employees who in the aggregate worked at least 4,000 hours per week, exclusive of hours of overtime, within the United States." (Doc. No. 21 at ¶ 84). Plaintiff further alleges that Defendants were each an "employer" as defined in "29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639(a), and continued to operate as a business until it decided to order or conduct the mass layoff or plant closing beginning on or about February 24, 2022." (Doc. No. 21 at ¶ 85). Additionally, Plaintiff alleges that "on or about February 24, 2022 and within 90 days thereof, Defendants ordered or conducted a mass layoff and/or plant closing at a single site, as those terms are defined by 29 U.S.C. § 210l(a)(2) and (3), and 20 C.F.R. § 639.3(i)(6) and (j)," (Doc. No. 21 at ¶ 86), and that these alleged layoffs/plant closings "resulted in 'employment losses,' as that term is defined by 29 U.S.C. § 2101(a)(3) for at least fifty of Defendants' employees," and "thirty-three percent (33%) of Defendant's workforce that worked at, received assignments from or reported to the Headquarters site, or at least 500 employees, pursuant to 29 U.S.C. § 2l01(a)(3)(B)(ii)." (Doc. No. 21 at ¶ 87). At base, Plaintiffs allege that

---

of the WARN Act. *See e.g., Hiles v. Inoveris, LLC*, No. 2:09-CV-53, 2009 WL 3671007, at *1 (S.D. Ohio Nov. 4, 2009) ("Plaintiffs allege that all of the named defendants constitute a single employer under the WARN Act, violated the Act by failing to provide Plaintiffs with advance notice of termination, and are jointly liable for that violation."); *Blough v. Voisard Mfg., Inc.*, No. 1:14 CV 263, 2015 WL 366934, at *7 (N.D. Ohio Jan. 27, 2015) ("Both parties move for summary judgment that [defendants] are a 'single employer' within the meaning of the WARN Act and are jointly liable for its violation."). For the purposes of the Motions, the question of whether Defendants are a "single employer" for the purposes of a WARN Act violation is not briefed by the parties, and so the Court will not analyze herein whether dismissal for either one of the Defendants is appropriate on the grounds that it should not be deemed to constitute (along with the other Defendant) a "single employer."

[7] The Amended Complaint defines the WARN Class as "similarly situated former employees who worked for the Call Center and who were terminated without cause, or were terminated without cause as a reasonably foreseeable consequence of the mass layoff or plant closing beginning on or around February 24, 2022 and within 90 days thereof." (Doc. No. 21 at ¶ 59).

"Defendants were required by the WARN Act to give Plaintiff and the [WARN Class] at least 60 days advance written notice of their terminations," but failed to do so. (Doc. No. 21 at ¶¶ 90-91). Finally, Plaintiff further alleges that "Defendants failed to pay Plaintiff and the [members of the WARN Class] their respective wages for 60 days following their respective terminations, and failed to provide employee benefits under COBRA for 60 days from and after the dates of their respective terminations." (Doc. No. 21 at ¶ 93).

The second claim ("Count II") is a state law claim for alleged violations of the New Jersey Worker Adjustment and Retraining Notification ("New Jersey WARN") Act, N.J.S.A. 34:21-1 (2007)[8] and is brought on behalf of Plaintiff individually and on behalf of members of a putative class ("New Jersey WARN Class").[9] Via Count II, Plaintiff alleges that "Defendants were required by the New Jersey WARN Act to give the New Jersey WARN Class members at least 60 days' advance written notice of their terminations," (Doc. No. 21 at ¶ 98), "Defendants failed to give the New Jersey WARN Class members written notice that complied with the requirements of the New Jersey WARN Act," (Doc. No. 21 at ¶ 99), and "Defendants failed to pay the Class Members their severance equal to at least one week of pay for each year of employment as required by the New Jersey WARN Act." (Doc. No. 21 at ¶ 100).[10]

---

[8] Neither Plaintiff nor Defendants contend that any iteration of the New Jersey WARN Act besides the 2007 version of the New Jersey WARN Act is applicable to the instant action. (Doc. No. 28 at 22; Doc. No. 31 at 28; Doc. No. 35 at 8).

[9] For context, the Court notes that Plaintiff defines the New Jersey WARN Class as "similarly situated New Jersey residents who worked for the Call Center and were terminated without cause beginning on or about February 24, 2022, and within 90 days of that date." (Doc. No. 21 at ¶ 73).

[10] Notably, the Amended Complaint states that the "Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1367 and 29 U.S.C. § 2104(a)(5)." The Court discerns that it may exercise original jurisdiction over Plaintiff's WARN Act claim in Count I pursuant to 28 U.S.C. § 1331 (and 29 U.S.C § 2104(a)(5), which provides that federal courts can exercise jurisdiction over WARN Act claims specifically). However, the Court finds that it may (not to say must) exercise jurisdiction over Plaintiff's state law New Jersey WARN Act claim in Count II (if at all) solely though supplemental jurisdiction pursuant to 28 U.S.C. § 1367. That is because Plaintiff has not pled that the Court may exercise diversity

Defendants base their Motions on several grounds. Defendants predominantly contend that the "Amended Complaint fails to state a claim under the WARN [A]ct"—i.e., that is it fails to state a claim in Count I—"for two reasons." (Doc. No. 28 at 10). Namely, according to Defendants, "[f]irst, [the] Amended Complaint does not include sufficient factual matter to allege that fifty employees were terminated at a single site of employment[, and] [s]econd, the WARN [A]ct does not apply to terminations that are the result of the completion of particular projects or undertakings []." (Doc. No. 28 at 10-11).[11] Defendants further contend, with respect to Count II, that because "[t]he New Jersey WARN Act requires both geographic proximity and that the place of employment be operated by an employer for a period of longer than three years," and because Plaintiff "does not and cannot allege either element, [Plaintiff] fails to state a claim for relief under the [New Jersey WARN] Act." (Doc. No. 28 at 21-22). Naturally, Plaintiff takes issue with these arguments, as will be detailed below as appropriate.

---

jurisdiction over any of her claims pursuant to 28 U.S.C. § 1332. The Amended Complaint omits not only allegations that the parties are diverse in citizenship, but also *any* allegations as to the amount in controversy; and the Amended Complaint certainly does not allege an amount in controversy in excess of the $75,000 required for diversity jurisdiction under 28 U.S.C. § 1332. Moreover, although this action is brought on behalf of a putative class, neither party argues that the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d), 1453, 1711–15 (and its jurisdictional provisions) is applicable to this action, and the Amended Complaint (lacking as it does any allegations as to the amount in controversy) certainly does not allege an amount in controversy in excess of $5,000,000 as required for CAFA to apply; for these reasons, the Court cannot conclude that CAFA is applicable to this action.

[11] As noted above, Defendant Navient purports to incorporate, in support of the Navient Motion, the arguments made in the Xtend Motion Memorandum, and the Court accepts that Defendant Navient incorporated the arguments made in the Xtend Motion Memorandum, so that the arguments therein will be applied by the Court to the Navient Motion.

<u>LEGAL STANDARD</u>[12]

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched

---

[12] Defendants also argue that many of Plaintiff's allegations should be "disregarded for purposes of determining whether she plausibly states a claim for relief." (Doc. No. 28 at 8-9, 17-20).

Defendants specifically contend that portions (or the entirety) of the allegations in paragraphs 26, 27, 28, 61, 65, 66, 68, and 85-90 should be disregarded because those allegations are mere legal conclusions (and thus not entitled to the presumption of truth at the motion to dismiss stage). Forgoing a detailed analysis of these allegations, the Court instead notes that to the extent that the Court found that those allegations did constitute (in whole or in part) legal conclusions, in line with a footnote above the Court has noted herein that it was not accepting those allegations as true for the purposes of the instant Motion by qualifying such allegations with a phrase such as "Plaintiff alleges."

Defendants also contend that Plaintiff's allegations made with reference to "information and belief," such as paragraph 12 of the Amended Complaint, are not entitled to the presumption of truth. (Doc. No. 28 at 10, 18). The Court does not accept this argument. As one district court recently found, "Circuits that have done a deep dive on the subject hold that even after *Iqbal* and *Twombly*, plaintiffs may plead facts upon information and belief where the facts are peculiarly within the possession and control of the defendant." *Hunter v. Booz Allen Hamilton, Inc.*, 418 F. Supp. 3d 214, 224 (S.D. Ohio 2019).

Here, Plaintiff's allegations made on "information and belief" largely concern management decisions made about the Call Center—such as, *inter alia*, the allegations in paragraphs 12, 16, 32, 38, and 39— information about which would almost certainly be "peculiarly within the possession and control of the" Defendants. *Hunter*, 418 F. Supp. 3d at 224. In other words, at this juncture of the action, when the Court is considering a motion to dismiss made prior to the parties engaging in discovery, Plaintiff may certainly plead facts on "information and belief," as it has done in the Amended Complaint, where those facts are "peculiarly within the possession and control of" the Defendants. *Id.* Put another way, the Court will accept as true for the purposes of the instant Motions those allegations that Plaintiff has made "upon information and belief" unless those allegations are legal conclusions or are otherwise not entitled to the presumption of truth for a different reason, in which case the Court would have noted that it was not accepting these allegations as true by prefacing these allegations with phrases such as "Plaintiff alleges" or "Plaintiff contends."

as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id.*; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id.* at 681. The question is whether the remaining allegations—factual allegations, i.e., allegations of factual matter—plausibly suggest an entitlement to relief. *Id.* If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id.* at 683.

DISCUSSION

The Court will begin its analysis with Plaintiff's federal WARN Act claim in Count I, before then analyzing Plaintiff's state law New Jersey WARN Act claim in Count II.

1. **COUNT I: The WARN Act**

The Court will begin its analysis of Count I by providing a brief overview of the WARN Act. Then the Court will analyze the particular points on which Defendants bring their Motions, namely examining what constitutes a "single site of employment" under the WARN Act, and the

applicability to remote (non-mobile) workers of certain of the WARN Act's regulatory provisions defining a "single site of employment."

a. The WARN Act Generally

The WARN Act was designed "to provide workers, their families, and communities with some warning about the sudden loss of employment." *Wiltz v. M/G Trans. Servs., Inc.*, 128 F.3d 957, 960 (6th Cir. 1997) (citing 20 C.F.R. § 639.1). "One of the purposes" of the WARN Act "is to provide local communities, as well as workers, some warning when a group of workers suddenly becomes unemployed in a short period of time." *Teamsters Loc. Union 413 v. Driver's, Inc.*, 101 F.3d 1107, 1109 (6th Cir. 1996). The WARN Act "requires employers to provide sixty-days advance notice to employees and communities concerning plant closings or mass layoffs." *Wiltz*, 128 F.3d at 960 (citing 29 U.S.C. § 2102(a)) (footnotes omitted). As the Sixth Circuit has noted, however, the WARN Act's provisions concerning plant closings or mass layoffs are "not triggered" unless "fifty or more employees are affected at a '*single site of employment*.'" *Wiltz*, 128 F.3d at 960 (quoting 29 U.S.C. § 2101(a)(2)) (emphasis added).

The WARN Act's statutory scheme also includes certain exemptions to potential liability. Pursuant to one of the exemptions on which Defendants rely in the instant Motions, the WARN Act does not apply to a plant closing or mass layoff if:

> the closing is of a temporary facility or the closing or layoff is the result of the completion of a particular project or undertaking, and the affected employees were hired with the understanding that their employment was limited to the duration of the facility or the project or undertaking[.]

29 U.S.C. § 2103(1).

b. A Single Site of Employment

As noted earlier, Defendants contend (specifically and at length) that Plaintiff has not adequately alleged that Plaintiff and other remote (non-mobile) employees at the Call Center who

were terminated in and after February 2022 worked at a "single site of employment" as required to state a claim under the WARN Act. (Doc. No. 28 at 10-20).[13] Plaintiff naturally disagrees. The parties' dispute has, in effect, two components. The first aspect of the dispute is whether Plaintiff and other remote (non-mobile) employees at the Call Center who were terminated in and after February 2022 were employed at a "single site of employment" as that term is defined in 20 C.F.R. § 639.3(i)(6) ("Subpart 6")[14] *in particular*. More specifically the issue is whether, under that particular definition, the Headquarters (which is the only potential "single site of employment" of Plaintiff and other remote (non-mobile) employees at the Call Center who were terminated in and after February 2022) actually qualifies as a (and the) "single site of employment" for those workers.

The second component is whether Subpart 6 (and its definition of a "single site of employment") applies to remote (non-mobile) workers, like Plaintiff and other remote employees at the Call Center, as a threshold matter. At base, if Subpart 6 *does not* apply to remote (non-mobile) workers, then Plaintiff will have failed to plausibly allege that she and other remote employees at the Call Center who were terminated worked at a "single site of employment" as required to state a claim under the WARN Act given that no other subparts of 20 C.F.R. § 639.3(i)—which provide various other definitions for what constitutes a "single site of

---

[13] As noted in an earlier footnote, the Court discerns that Plaintiff and Defendants use the term "remote employees" to mean employees who work virtually (i.e., telecommute), and are not required to physically report to a specific location or site for work and do not otherwise *travel for* work.

[14] Subpart 6 provides a definition of a "single site of employment" that is applicable specifically to workers without a fixed site of work. Other subparts of 20 C.F.R. § 639.3(i) provide various other context-specific definitions of "single site of employment," but none of the parties contend that any other subpart (beyond Subpart 6) is applicable to the instant action.

employment"—seem to the Court (or to the parties, given that they do not argue otherwise) applicable to the instant action.[15]

Accordingly, below the Court will analyze the definition of "single site of employment" under the WARN Act and its applicable regulations, including Subpart 6. The Court will also consider whether Plaintiff has adequately alleged that Plaintiff and other remote (non-mobile) employees at the Call Center were employed at a "single site of employment" as defined in Subpart 6 (and thus were collectively terminated at a "single site of employment" within the meaning of the WARN Act, *see Wiltz*, 128 F.3d at 960 (WARN Act's provisions concerning plant closings or mass layoffs are "not triggered" unless "fifty or more employees are affected at a '*single site of employment*.'") (quoting 29 U.S.C. § 2101(a)(2)) (emphasis added))) and whether Subpart 6 applies as a threshold matter to remote workers like Plaintiff and other remote employees at the Call Center.

### i. Single Site of Employment Generally

As an initial matter, the Court notes that although the WARN Act's statutory scheme does not define what constitutes a "single site of employment," the Department of Labor has "promulgated regulations that provide guidance in interpreting the statute." *Driver's, Inc.*, 101 F.3d at 1109. Specifically, the Department of Labor promulgated 20 C.F.R. § 639.3(i), which provides various criteria for what does and does not constitute a "single site of employment" for the purposes of the WARN Act. As relevant here, 20 C.F.R. § 639.3(i)(6) (i.e., "Subpart 6," as

---

[15] As noted, Plaintiff does not contend that the other subparts of 20 C.F.R. § 639.3(i), which provide other definitions of a "single site of employment," are applicable to the instant action. So, if Subpart 6 (and, of course, its definition of a "single site of employment") does *not* apply to remote (non-mobile) workers like Plaintiff, then Plaintiff has failed to state a claim under the WARN Act because she has failed to plausibly suggest that the terminations took place at a "single site of employment." Nevertheless, it is worth doing what the Court is doing here: discussing the overall context (comprised of various context-specific definitions of "single site of employment")—in which Subpart 6 is found.

noted above) provides guidance on what constitutes a "single site of employment" for those workers who do not have a fixed place of employment, which *potentially* could be deemed to include Plaintiff and other remote (non-mobile) employees at the Call Center.[16] The regulation provides:

> (6) For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report will be the single site in which they are covered for WARN purposes.

The plain text of Subpart 6 suggests that for Plaintiff and other remote (non-mobile) employees at the Call Center, "whose primary duties involve[d] work outside any of the employer's regular employment sites" (e.g., the Headquarters), the Headquarters—being the place "from which their work is assigned, or to which they report"—might constitute a "single site of employment" for the purposes of the WARN Act. However, binding precedent from the Sixth Circuit suggests otherwise, and indeed some case law, both from the Sixth Circuit and from other Courts of Appeals and district courts, suggests that Subpart 6 is entirely inapplicable to remote (non-mobile) workers like Plaintiff and other remote employees at the Call Center.

---

[16] For now, the Court notes that Plaintiff and other remote (non-mobile) employees at the Call Center are *potentially* within the scope of Subpart 6, and proceeds to address whether Plaintiff has plausibly suggested that she and other remote (non-mobile) employees at the Call Center would properly be deemed to have worked "at a single site of employment" within the meaning of Subpart 6. Later, the Court resolves the question of whether Plaintiff and other remote (non-mobile) employees at the Call Center are *actually* within the scope of Subpart 6, and discusses the consequences of the Court's answer to that question. But right here, essentially assuming *arguendo* that Plaintiff and other remote (non-mobile) employees at the Call Center are *potentially* within the scope of Subpart 6, the Court addresses whether it is plausible, based on Plaintiff's allegations, that these employees worked at a "single site of employment," i.e., the Call Center, as defined by Subpart 6.

*ii. The Sixth Circuit's Interpretation of Single Site of Employment: Geographic Proximity*

The Sixth Circuit has found that although "no bright line test exists [for finding a "single site of employment"], the plain language of the [WARN Act] and [its] regulations makes clear that geographic proximity provides the touchstone in determining what constitutes a 'single site.'" *Driver's*, 101 F.3d at 1109.[17] In *Driver's*, the Sixth Circuit interpreted 20 C.F.R. § 639.3(i) generally and Subpart 6 specifically in a case involving whether multiple facilities (in this case truck terminals) to which (the plaintiff) truckers were assigned could be aggregated to constitute a "single site of employment" collectively under the WARN Act. The Sixth Circuit found that these disparate sites could not be aggregated to constitute a "single site of employment." In relevant part, the Sixth Circuit held that "[c]ontiguous facilities or those in close geographic proximity are generally single sites of employment and geographically separate facilities are generally separate sites." *Driver's*, 101 F.3d at 1109 (citing 20 C.F.R. § 639.3(i)(1-6)). The Sixth Circuit further held that "[t]he [WARN Act] and [its] regulations plainly focus on whether the resulting job loss will be concentrated in one geographic area," *id.*, and found, interpreting 20 C.F.R. § 639.3(i) generally and Subpart 6 specifically, that "geographic considerations weigh heavy in the analysis" of what

---

[17] Given the case law outlined below, the Court discerns that when the Sixth Circuit refers to "geographic proximity," it is referring to the proximity of the workers' work sites to one another (to the extent applicable) and the geographic proximity of the individuals working on those sites to one another (i.e., the extent to which those individuals all live in the same geographic area). This only makes sense given that in discussing geography, the Sixth Circuit has examined both the geographic location of where the workers physically *work*—i.e., a consideration of the location of the facilities where workers worked, like the trucker terminals in *Driver's*—as well as the geographic location of the workers themselves (i.e., where the workers *live*)—insofar as the Sixth Circuit has noted that the WARN Act and its regulations "plainly focus on whether the resulting job loss will be *concentrated in one geographic area.*" *Driver's*, 101 F.3d at 1110 (emphasis added). The Court's interpretation of the Sixth Circuit's discussion here is buttressed by the WARN Act itself, given that one of the purposes of the WARN Act is to "provide local communities, as well as workers, some warning when a group of workers suddenly becomes unemployed in a short period of time." *Driver's*, 101 F.3d at 1109. In other words, the WARN Act itself also seems to contemplate a focus on where the employees *live,* given the Act's focus on the impact of layoffs on local communities.

constitutes a "single site of employment." *Id.* at 1110. The Sixth Circuit then analyzed Subpart 6 specifically:

> This subpart *addresses employees who travel from place to place in the course of performing their job.* (See n.1, supra.) Examples are railroad and airline workers and travelling salespersons. [Subpart 6] states "the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report will be the single site in which they are covered . . .." (Emphasis added.) This subpart is written in the disjunctive: any one of the alternatives may qualify as the definition of "single site." In promulgating [Subpart 6], the Department of Labor indicated it was concerned about "travelling workers who report to but do not work out of a particular office." 54 Fed. Reg. 16,042, 16,051 (1989). "While such workers may well be considered as a separate operating unit, their status must be determined in terms of the single site of employment to which they are assigned." *Id.*

*Id.* at 1110 (emphasis added).[18]

Notwithstanding *Driver's*, the Sixth Circuit has retreated somewhat from the primacy of geographic proximity when considering whether workers had a "single site of employment" under 20 C.F.R. § 639.3(i) generally and under Subpart 6 specifically. In *Wiltz v. M/G Transport Servs., Inc.*, 128 F.3d 957 (6th Cir. 1997), which was decided a year after *Driver's*, the Sixth Circuit also analyzed 20 C.F.R. § 639.3(i) generally and Subpart 6 specifically. In *Wiltz*, the Sixth Circuit reversed the district court's finding that towboat-barges were separate sites of employment for the workers on the towboat-barges, finding instead that the homebase of the vessels in Paducah, Kentucky was the "single site of employment" for those working on various towboat-barges. In relevant part the Sixth Circuit found:

> [T]he regulation [(Subpart 6)] focuses on the place to which employees are assigned as their home base, from which their work is assigned, or to which they will report. Each of these factors point in only one direction: Paducah, Kentucky. There is uncontroverted proof in the record that all crew assignments to towboats were made by [the] Paducah office, and that 80% of the crews physically reported to Paducah for assignment to the towboats. In fact . . . counsel for [defendant] represented that "[o]ne port, Paducah, Kentucky, is used in our employee system." Counsel for

---

[18] Whether this subpart even applies in the present case is an issue that the Court takes up below.

[defendant] also attested in an affidavit filed with the court that "[Defendant] has its offices and operational headquarters in Paducah, Kentucky . . .."

Furthermore, it is undisputed that fuel and lubrication oil for the towboats were ordered and purchased by the Paducah office and delivered to the various towboats at various locations set by the Paducah office. The chief engineer and assistant engineer reported to the . . . port engineer in Paducah. All captains, pilots, mates, cooks, and deckhands reported to the . . . port captain in the Paducah office. In sum, absent the fiction that the towboats here were "floating sites," the only conclusion to be drawn on this record is that Paducah was the "single site of employment" for plaintiffs.

*Id.* at 962. The Sixth Circuit also took pains to distinguish *Driver's*, stating specifically:

*Driver's, Inc.* is distinguishable. There we determined that eleven different truck terminals operated by a single employer in six states did not constitute a "single site" under [Subpart 6]. Critical to that decision was the fact that each trucker started and ended his day from the same terminal, one near his or her residence, and that the terminals were hundreds of miles apart. We held that "[t]his terminal [was] the trucker's 'home base.'" *Driver's, Inc.,* 101 F.3d at 1110. Because the true focus was the terminal, and not the trucks themselves, the analysis of subpart (6), while applicable, was not dispositive. *Id.* (noting also that "subpart (6) cannot be read in a vacuum ... [t]he other subparts of the regulation provide guidance in determining what is a 'single site' and, as discussed above, geographic considerations weigh heavy in the analysis"). Thus, *Driver's, Inc.*'s presumption that absence of community impact cuts against a finding of "single site" is not fatal to plaintiffs' claim in this case. *See id.* at 1109 (noting that statute and regulations "plainly focus on whether the resulting job loss will be concentrated in one geographic area").

*Id.* at 962-963 (footnotes omitted). In light of *Wiltz*, geographic proximity—presumably meaning, in line with the analysis in the footnote above, the proximity of the worksites to one another and proximity of the workers themselves to one another—is an important consideration for a court to consider in determining whether there is a "single site of employment" under Subpart 6, but it is not *determinative* of that question.[19] Indeed, in interpreting *Driver's Inc.*, *Wiltz*, noted that there is a presumption that a lack of community impact from layoffs cuts against finding a "single site of

---

[19] This is in contrast to Plaintiff's assertion (Doc. No. 31 at 14) that *Wiltz* makes geographic proximity irrelevant when considering Subpart 6.

employment," but that a lack of community impact is not necessarily fatal to the prospect of finding

a "single site of employment" under Subpart 6. *Id.* at 963.[20]

Assuming that Subpart 6 applies to remote (non-mobile) workers like Plaintiff at all (which

as will be noted below is not at all clear), this case law suggests (albeit not dispositively) one thing:

generally, remote (non-mobile) workers, like Plaintiff, do not have a "single site of employment"

as defined in Subpart 6. The Sixth Circuit's binding precedent teaches the Court that the plain

language of the WARN Act and its "regulations makes clear that geographic proximity provides

the touchstone in determining what constitutes a 'single site,'" *Driver's*, 101 F.3d at 1109, and this

cuts against finding that remote (non-mobile) workers like Plaintiff and other remote employees

at the Call Center have a "single site of employment." On the other hand, the Court notes that the

Sixth Circuit's guidance that "[c]ontiguous facilities or those in close geographic proximity are

generally single sites of employment and geographically separate facilities are generally separate

---

[20] Of course, it may seem to the reader (and to the Court) that the question of whether employees are at a "single site of employment" *should* precede any analysis as to whether there was community impact from the layoffs of employees. What the Court means is that the fact that terminated employees are at a "single site of employment" tends to indicate that the termination of those employees has a local community impact (i.e., that local community impact *follows* from employees being at a "single site of employment"). However, the Sixth Circuit, by recognizing a sort of "presumption" against finding a single site of employment where there is no community impact from any layoff of employees, seems to be putting the cart before the horse, insofar as this "presumption" suggests that courts should consider first whether there was community impact from layoffs, and then retrofit any analysis of whether employees were at a single site of employment to align with whether there was a community impact from the layoffs of employees— specifically by finding a single site of employment where there is a community impact, or by declining to find a single site of employment where there is no community impact. In other words, under the Sixth Circuit's paradigm, to answer to the question of whether terminated employees were at a single site of employment follows in (part) from whether the termination of those employees had a community impact, when perhaps logically it should work the other way around: the court answers whether there was a single site of employment and, if so, then naturally the layoffs likely would occasion (negative) community impacts around that site (or the place of residence of workers who work at that site). So there is reason to question the wisdom of this "presumption" and analytical framework,

  Nevertheless, the Court is bound by the Sixth Circuit's holding here and thus—in addressing whether Plaintiff and other remote employees at the Call Center were employed at a "single site of employment"— will consider whether Plaintiff's allegations suggest that there was a local community impact (somewhere, anywhere) from the layoffs of Plaintiff and other remote (non-mobile) employees at the Call Center.

sites," *Driver's*, 101 F.3d at 1109 (citing 20 C.F.R. § 639.3(i)(1-6)), seems inapplicable to the instant action, which, as noted in a footnote above involves purely remote (non-mobile) workers who telecommute for work. This is because remote (non-mobile) workers who telecommute would not seem to have work settings that would invoke a concept such as "facilities" as envisioned by the Sixth Circuit in *Driver's*.[21]

With that said, the Sixth Circuit's finding that the WARN Act and its regulations "focus on whether the resulting job loss will be concentrated in one geographic area," *id.*, seems especially applicable to the instant action. Indeed, as the court in *Wiltz* observed, there is a "presumption" that absence of community impact from layoffs cuts against finding a "single site of employment."[22] *Wiltz*, 128 F.3d at 963. Given the realities of remote work, which frequently involves employees telecommuting from various communities, counties, and even states, this (binding) case law from the Sixth Circuit generally cautions against finding a "single site of employment" based on Subpart 6 for remote (non-mobile) workers, like Plaintiff and other remote employees at the Call Center. This must be so because layoffs of remote (non-mobile) workers— given the inherent nature of remote workers as geographically dispersed workers who can telecommute from anywhere (in theory)—would seem to not involve the community impact from layoffs contemplated by the Sixth Circuit. Put another way, the general absence of specific community impact from the layoff of remote (non-mobile) workers—and the absence of any allegations in the Amended Complaint discussing community impact from Plaintiff's layoff and the layoff of other remote (non-mobile) employees at the Call Center—cuts against finding that

---

[21] Indeed, these remote (non-mobile) workers also not would seem to be "travelling workers who report to but do not work out of a particular office," which the Sixth Circuit observed in *Driver's* were contemplated by Subpart 6. 101 F.3d at 1110 (quoting 54 Fed. Reg. 16,042, 16,051 (1989)).

[22] In line with the footnote above, although the Court observes that this reasoning may be backwards, the Court nevertheless will apply this reasoning as it is binding Sixth Circuit precedent.

Plaintiff and other remote employees at the Call Center who were terminated worked at a "single site of employment" as defined by Subpart 6. Such lack of community impact is, of course, not dispositive to finding a lack of a "single site of employment," *Wiltz*, 128 F.3d at 963, but it does support such a finding.

Still, as will be discussed below, even assuming that Plaintiff has adequately alleged that she (and other remote (non-mobile) employees at the Call Center) worked at a "single site of employment" as defined in Subpart 6, that would not save Plaintiff's WARN Act claim in Count I, given the Court's conclusion (explained below) that Subpart 6 does *not* apply to remote (non-mobile) workers.

### iii. Subpart 6 and Mobile Workers

Beyond the focus on what *constitutes* a "single site of employment" under Subpart 6, the Sixth Circuit has also hinted at just what kinds of workers Subpart 6 applies to. The issue is crucial because if Subpart 6 is not applicable in the present case, then it does not matter whether Plaintiff and the putative class members in this case worked at "a single site of employment" within the meaning of Subpart 6.

In *Driver's,* the Sixth Circuit observed that Subpart 6 "addresses employees who travel from place to place in the course of performing their job." *Driver's*, 101 F.3d at 1110. *Wiltz* also explained that as "a practical matter, there is probably little geographic impact under the scenarios described in [S]ubpart 6. Notwithstanding, the Department of Labor felt that *mobile workers* needed some protection, and we must accommodate that concern in our interpretation of the Act and regulations." *Wiltz*, 128 F.3d at 963 n.10 (emphasis added). All told, *Wiltz* and *Driver's* take the important step of framing Subpart 6 as applying to *mobile workers*—seemingly workers who *travel for* work such as the railroad workers, bus drivers, and salespersons specified in Subpart

6—and not the remote (non-mobile) workers in the form of Plaintiff and other remote employees at the Call Center, who do not *travel for* work.

The Sixth Circuit's interpretation of Subpart 6 is supported by the Department of Labor commentaries on the WARN Act regulations. In those commentaries, the Department of Labor explained that Subpart 6 was promulgated "[i]n order to cover [the situation of railroad industry maintenance crews who have no home base] and the situation of outstationed workers and traveling workers who report to but do not work out of a particular office . . .." Commentary to Worker Adjustment and Retraining Notification Act, 54 Fed. Reg. 16042, 16051 (April 20, 1989) (emphasis added). The commentary also refers to Subpart 6 as "that part of the regulation relating to *mobile workers*." *Id* (emphasis added). *See also Meson v. GATX Tech. Servs. Corp.*, 507 F.3d 803, 809-10 (4th Cir. 2007) (discussing these commentaries).

Indeed, relying in part on this commentary, the Fourth Circuit has concluded that although Subpart 6 "could be read literally to cover almost any employee who leaves her office, we believe it was intended to apply only to truly mobile workers without a regular, fixed place of work." *Meson*, 507 F.3d at 809.[23] The Fourth Circuit reasoned:

> A close scrutiny of [Subpart 6's] language supports this conclusion. The terms "travel ... from point to point," "outstationed," and "home base," all connote the absence of a fixed workplace. *See Ciarlante*, 143 F.3d at 146 (defining "home base" as "a site that the employee visits during the course of a typical business trip"); *Bader*, 503 F.3d at 819 ("The term [outstationed] most logically connotes a situation where employees live for a short period of time at a certain site, departing for home when the work is done."). The examples provided in [Subpart 6] also support this view. Bus drivers and railroad workers have no fixed workplace or office. Indeed, their jobs are characterized by travel and mobility. Although the provision includes "salespersons" as examples, the context suggests that this reference is to *traveling* salespersons who work primarily out of their homes or cars, rather than those who work out of fixed offices.

---

[23] Indeed, even the broader (and rejected) conception of the applicability of Subpart 6 postulated *arguendo* by the Fourth Circuit—namely that Subpart 6 could (in theory) "be read literally to cover almost any employee who leaves her office," *Meson*, 507 F.3d at 809—would not include Plaintiff, because Plaintiff did not have a job whereby she would ever leave "her office," i.e., her home office, for work.

Case 3:25-cv-00013    Document 63    Filed 03/31/26    Page 20 of 28 PageID #: 443

*Id.* at 809 (emphasis added). In other words, in the (non-binding but persuasive) view of the Fourth Circuit, Subpart 6—the sole provision of 20 C.F.R. § 639.3(i) that Plaintiff contends applies to Plaintiff and other remote (non-mobile) employees at the Call Center—applies only to those workers who *travel for* work, and *not* workers who are merely remote (e.g., do not *travel for* work). *See also Bader v. Northern Line Layers, Inc.*, 503 F.3d 813, 819 (9th Cir. 2007) ("The [Department of Labor's] comments explain that its regulation was intended to apply to 'mobile workers,' including 'outstationed workers and traveling workers who report to but do not work out of a particular office.'"). In other words, in the view of the Fourth Circuit, Subpart 6 does not apply to remote (non-mobile) workers like Plaintiff and other remote employees at the Call Center—who do not *travel for* work—and thus these workers are not able to invoke the WARN Act's protections on the basis of Subpart 6's definition of a "single site of employment."

This is echoed in certain (although not all) district court opinions addressing the WARN Act's applicability to remote (non-mobile) workers. For example, in *Piron v. Gen. Dynamics Info. Tech., Inc.*, Civ. A. 3:19-cv-709, 2020 WL 1159383 (E.D. Va. Mar. 10, 2020) ("*Piron I*"), the district court considered a WARN Act claim from employees who worked "'remotely' from their homes but reported to, and received assignments from, managers . . . situated in [a] Falls Church, Virginia office." *Id.* at *1. Applying *Meson*, the court in *Piron I* found:

> The application of *Meson* to the Amended Complaint necessitates the conclusions that Subpart Six does not save the Amended Complaint because the Amended Complaint does not allege facts from which it plausibly could be held that the Plaintiffs fit within the "mobile worker" interpretation given to Subpart Six by the Fourth Circuit in *Meson*. *See id.* Indeed, the only part of the Amended Complaint on which the Plaintiffs rely to bring them within the reach of Subpart Six is that the Plaintiffs "worked remotely." ECF No. 5 at ¶ 10. That simply does not comport with the Fourth Circuit's decision in *Meson*. Therefore, the Amended Complaint fails to adequately or plausibly allege an element of the asserted WARN Act claim: the single site of employment element.

*Id.* at \*4.[24] And in *In re Storehouse, Inc.*, No. 06-11144-SSM, 2010 WL 4453849 (Bankr. E.D. Va. Nov. 3, 2010), a bankruptcy court found (albeit in dicta) that if a worker had chosen to work from home:

> he would still have had a single site of employment. His residence . . . would have been his single site of employment, since it would have been his fixed workspace when he was not traveling for work. Therefore, even treating [the employee] as a true telecommuter, he still worked at a single site of employment with fewer than 50 employees for purposes of the WARN Act. The alternative to finding that a telecommuter's single site of employment is his or her home would be to find that

---

[24] Plaintiff contends that the decision in *Piron v. Gen. Dynamics Info. Tech.*, No. 3:19-CV-709, 2022 WL 363958 (E.D. Va. Feb. 7, 2022) ("*Piron II*") shows that Subpart 6 can apply to remote (non-mobile) workers. (Doc. No. 38 at 20-21; Doc. No. 42 at 8-11). Yet the reliance on *Piron II* is misplaced. It is true that in *Piron II* the district court certified a class of individuals who worked remotely—including some who travelled, i.e., were "mobile"—and some who worked solely from home. *Piron II*, 2022 WL 363958 at \*3-4. Yet crucially in *Piron II*, which involved a motion for class certification, the court declined to "engage in a full merits-based analysis of whether Plaintiffs can prove a 'single site of employment.'" *Id.* at \*13. In other words, *Piron II* hardly feels instructive for the Court's instant inquiry, which is an analysis of motions to dismiss concerned with whether Plaintiff alleged that she and other remote employees at the Call Center were employed at a "single site of employment."

Plaintiff also refers to the Second Amended Complaint in the *Piron* action (rather than the First Amended Complaint in the *Piron* action, which was discussed earlier herein and was dismissed in *Piron I*), which she attaches as an exhibit (Doc. No. 42-1) to the Navient Motion Response. Plaintiff argues that although the court in *Piron I* had dismissed the First Amended Complaint (in the *Piron I* decision discussed herein) "based on concerns that it could not meet *Meson's* requirements[,] the Second Amended Complaint—which lacked any travel allegations for some of the employees, was sufficient to plead the 'so-called 'mobile worker' category[,]' as the court noted when it refused to dismiss that complaint." (Doc. No. 42 at 10 n.5). Plaintiff has attached a copy of the court's order in *Piron* declining to dismiss the Second Amended Complaint at Docket No. 42-2 ("Dismissal Order"). The Court has reviewed the Dismissal Order and finds it not germane to the instant motion, given that the Dismissal Order does not provide substantive reasoning for declining to dismiss the Second Amended Complaint and instead merely notes that "the Second Amended Complaint alleges facts from which it plausibly could be held that the plaintiffs and class members fit within the so-called 'mobile worker' category interpreted . . . in *Meson*." (Doc. No. 42-2 at 2). Ultimately, the parties *in Piron* settled the action, but as one court noted in analyzing *Piron*:

> in Memorandum of Law in Support of the Joint Motion for Final Approval of Settlement [in *Piron*] (hereinafter the "Settlement Memo"), the putative plaintiffs admitted they "still must prove they were 'truly mobile workers' under applicable WARN Act regulations as interpreted by the Fourth Circuit in *Meson*[.]" The putative plaintiffs also admitted that "class members' job positions varied, as did the amounts they travelled, which may hinder their sustaining *Meson*'s standard for mobility.

*Weatherwax v. Sunnova.*, No. 25-90160, 2026 WL 598476, at \*10 (Bankr. S.D. Tex. Mar. 3, 2026) (footnotes omitted). Put another way, the Court discerns that aside from the order in *Piron I*, there is little in *Piron* on which the Court can (or indeed should) rely in resolving the instant Motions.

the single site of employment is determined by where he or she receives work from and reports to. Such an interpretation would not make sense within the broader outlines of the WARN Act. As the Fourth Circuit stressed in *Meson,* a major objective of the Act is to warn communities in addition to individual workers of the impending economic disruption of a major layoff or plant closing. . *Meson*, 507 F.3d at 811. The Court further highlighted that Congress's decision to target only those layoffs affecting 50 or more people in a single locale is significant. It supports the conclusion that 20 C.F.R. § 639.3(i)(6) does not apply when fewer than 50 community residents have lost their job as a result of a single layoff. In this case [the plaintiff] was not a mobile worker and therefore he had a single site of employment. The layoff at his site of employment was fewer than 50 people and therefore he does not qualify for protection under the WARN Act.

*Id.* at *4. The views of the court in *In re Storehouse, Inc.* are somewhat difficult to parse (and in any event are dicta) but do suggest that the court would have found non-mobile, remote workers not to be covered by Subpart 6.[25]

But the views (of *Meson* and the other cited courts) discussed above are not without detractors. For instance, in *Hoover v. Drivetrain LLC*, No. AP 20-50966, 2022 WL 3581103 (Bankr. D. Del. Aug. 19, 2022), the court held that although the focus of Subpart 6 "appears to be

---

[25] The analyses in *Piron I* and *In re Storehouse* appear to conflate the issues of whether Subpart 6 *applies* to remote (non-mobile) workers as a threshold matter and the issue of whether remote (non-mobile) workers work at a "single site of employment" as that term is *defined* in Subpart 6. The Court understands why district courts would seem to conflate these issues, but they are distinct; the first question is whether Subpart 6 provides the applicable test for "single site of employment" for particular kinds of workers and the second question is whether (assuming *arguendo* that Subpart 6 is applicable) under Subpart 6's test these workers were at a "single site of employment." Notably, here (in this particular section of this Memorandum Opinion) the Court is merely considering the threshold question of whether Subpart 6 *applies* to remote (non-mobile) workers. And indeed, scrutiny of *Piron I* and *In re Storehouse* reveals that both cases suggest that Subpart 6 does not apply to remote (non-mobile) workers. *See Piron I*, 2020 WL 1159383, at *4 (finding that Plaintiffs do not fit "within the 'mobile worker' interpretation given to Subpart Six by the Fourth Circuit in *Meson*" because "the only part of the Amended Complaint on which the Plaintiffs rely to bring them within the reach of Subpart Six is that the Plaintiffs 'worked remotely.'"); *In re Storehouse*, 2010 WL 4453849, at *4 (suggesting that Subpart 6 would not apply because plaintiff was not a mobile worker).

In any event, the Court notes again for context that under Plaintiff's theory of the case, the element of a "single place of employment" can be satisfied if, and only if, Subpart 6 applies to remote (non-mobile) workers like Plaintiff and other remote employees at the Call Center, because Plaintiff suggests that such satisfaction occurs, if at all, specifically under Subpart 6. In other words, Plaintiff has not plausibly suggested that this element can be satisfied if Subpart 6 is inapplicable.

more on 'mobile' employees – those who travel regularly rather than reporting to an office – than those who telecommute from home offices, the text of the regulation undoubtedly covers remote employees." *Id.* at *4. And in *Weatherwax v. Sunnova.*, No. 25-90160, 2026 WL 598476 (Bankr. S.D. Tex. Mar. 3, 2026), the court rejected *Meson's* holding and found that a remote (non-mobile) "employee could potentially fall within" Subpart 6. *Id.* at *14. [26]

While the view of the Fourth Circuit is plainly not universally held, the Court is persuaded by the view of the Fourth Circuit that although Subpart 6 "could be read literally to cover almost any employee who leaves her office, we believe it was intended to apply only to *truly mobile workers* without a regular, fixed place of work." *Meson*, 507 F.3d at 809. As noted above, the Fourth Circuit's view is buttressed by the Commentary to Worker Adjustment and Retraining Notification Act, 54 Fed. Reg. 16042 (1989), which refers to Subpart 6 as "that part of the regulation relating to *mobile workers*." *Id* at 16051. (emphasis added). The language of the Sixth Circuit in *Driver* and *Wiltz*, where the Sixth Circuit referred to Subpart 6 as addressing "employees

---

[26] Plaintiff also relies on a handful of other WARN Act cases for her contention that Subpart 6 applies to remote (non-mobile) workers, but such reliance is unavailing.

Plaintiff relies on *Kephart v. Data Sys. Int'l*, 243 F. Supp. 2d 1205 (D. Kan. 2003), wherein the court denied in part a defendant's motion for summary judgment on a WARN Act claim. *Kephart* involved employees who, while working from home or regional offices, travelled to a corporate office and had phone extensions at that office. *Id.* at 1223. In other words, *Kephart* is inapplicable to the instant action, which involves *fully* remote, non-mobile employees.

Plaintiff also relies on *Gray v. Oracle*, Case No. 2:05-CV-534-TS, 2005 WL 3132344 (D. Utah Nov. 22, 2005). In *Gray*, the district court denied a motion to dismiss a WARN Act claim, in the process (seemingly) rejecting a defendant's argument that "where an employee works from a home office, he or she has a fixed place of work." *Id.* at *1. Yet *Gray's* application here is limited, given that in *Gray* the district court was interpreting a *pro se* complaint (and thus interpreting it liberally), *id.* at *2, and was applying the then-applicable "no set of facts" standard (of *Gibson v. Conley*, 355 U.S. 41 (1957)), *id.* at *1, a standard that thereafter was overruled by *Twombly. See Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 541 (6th Cir. 2007) ("*Twombly* held that the 'famous' no-set-of-facts formulation 'has earned its retirement'" . . . .).

Finally, Plaintiff cites *Schmidt v. FCI Enterprises*, No. 118-CV-01472-RDAJFA, 2019 WL 5748952, at *4 (E.D. Va. Nov. 5, 2019). Yet *Schmidt* involved employees who "travelled across the United States and serviced contracts at various clients' facilities," *id.* at *4, a fact pattern entirely missing from the Amended Complaint.

In short, these three cases are plainly distinguishable from the instant action and thus do not avail Plaintiff.

who travel from place to place in the course of performing their job" *Driver's*, 101 F.3d at 1110, and as protecting "mobile workers," *Wiltz*, 128 F.3d at 963 n.10, further reinforces this Court's view that the Fourth Circuit is correct that Subpart 6 is meant to apply *solely* to mobile workers, i.e., those who *travel for* work, and not remote (non-mobile) workers, like Plaintiff and other remote employees at the Call Center, who telecommute and do not otherwise *travel for* work. The Court acknowledges that there is room for disagreement on this point, as shown by the decisions in *Hoover v. Drivetrain LLC*, No. AP 20-50966, 2022 WL 3581103 (Bankr. D. Del. Aug. 19, 2022) and *Weatherwax v. Sunnova.*, No. 25-90160, 2026 WL 598476 (Bankr. S.D. Tex. Mar. 3, 2026) discussed above. But the Court finds that the better course is to follow persuasive (if not binding) case law from another circuit interpreting a regulation (Subpart 6)—an interpretation which is supported by commentaries on that regulation and is buttressed by the Sixth Circuit's observation that Subpart 6 "addresses employees who travel from place to place in the course of performing their job," *Driver's*, 101 F.3d at 1110, and protects, "mobile workers," *Wiltz*, 128 F.3d at 963 n.10.

So, the Court concludes that Subpart 6 (along with its definition of what constitutes a "single site of employment") does not apply to remote (non-mobile) workers like Plaintiff and other remote employees at the Call Center, who telecommute for work and do not otherwise *travel for* work. Put another way, even if Plaintiff plausibly alleged that she and other remote employees at the Call Center who were terminated were employed at a "single site of employment" as defined in Subpart 6, the Court finds that Subpart 6 does *not* apply to remote (non-mobile) workers like Plaintiff as a threshold matter. And given that Plaintiff relies solely on the applicability of Subpart 6 to assert that she (and the other workers at issue) worked at a "single site of employment," Plaintiff has not plausibly suggested that she and other remote (non-mobile) employees at the Call Center who were terminated worked at a "single site of employment." Therefore, Plaintiff has

failed to state a claim under the WARN Act. *See Wiltz*, 128 F.3d at 960 (the WARN Act's provisions concerning plant closing or mass layoffs are "not triggered" unless "fifty or more employees are affected at a '*single site of employment*.'" (emphasis added)).[27]

Accordingly, Plaintiff's federal WARN Act claim in Count I will be dismissed with prejudice.

### 2. Count II: New Jersey WARN Act

That leaves only Plaintiff's state law claim asserting a breach of the state New Jersey WARN Act in Count II. As noted in the footnote above, as long as Plaintiff's federal WARN Act claim in Count I remained pending, the Court discerned that it could (not to say *must*) exercise jurisdiction over Plaintiff's state law New Jersey WARN Act claim in Count II solely through supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

It is well-settled that a district court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3); *see also Ford v. Frame*, 3 F. App'x 316, 318 (6th Cir. 2001) ("[D]istrict courts possess broad discretion in determining whether to retain supplemental jurisdiction over state claims once all federal claims are dismissed."). The Supreme Court has noted that "in the usual case in which all federal-law

---

[27] Because the Court finds that Plaintiff has failed to state a claim under the WARN Act for the reasons just discussed, the Court will not analyze Defendants' alternative argument for dismissal of Count I; namely that "[b]ecause the allegations in the Amended Complaint . . . reveal that [Plaintiff] knew she was hired for an interim position at [the Call Center]," Plaintiff's claim falls within the 29 U.S.C. § 2103(1) exemption for liability under the WARN Act (detailed earlier herein by the Court), "and the WARN Act does not apply to her employment." (Doc. No. 28 at 20). And given that the Court is not addressing this argument, the Court will not address Plaintiff's response to this argument that the WARN Act is remedial and that therefore exemptions to the WARN Act should be read narrowly. (Doc. No. 31 at 8, 24).

For context, the Court notes that it acknowledges that the WARN Act is remedial and should be construed broadly "to effectuate its purposes." *L. v. Am. Cap. Strategies, Ltd.*, No. 3:05-0836, 2006 WL 1639092, at *4 n.2 (M.D. Tenn. June 12, 2006) (quoting *Snider v. Commercial Fin. Servs., Inc.*, 288 B.R. 890, 295 (Bankr.D.Okla.2002)). Even so, such broad construal does not ultimately prevent or affect the Court's conclusion that Subpart 6 does not apply to remote (non-mobile) workers like Plaintiff and the other remote employees at the Call Center.

claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims."); *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

Having determined that Plaintiff's federal claim in Count I (over which the Court has original jurisdiction) should be dismissed, and because the Court finds that the aforementioned factors weigh in favor of declining jurisdiction over Plaintiff's state law claim in Count II, the Court declines *sua sponte* (*sua sponte* given that no party argued that the Court should decline to exercise supplemental jurisdiction over Count II if Count I is dismissed) to exercise supplemental jurisdiction over Plaintiff's state law claim. Instead, the Court will dismiss this claim without prejudice. *See Amaechi v. Univ. of Ky.*, No. CIVA09-118-KSF, 2010 WL 1562824, at *2 (E.D. Ky. Apr. 19, 2010) ("Pursuant to 28 U.S.C. § 1367(c)(3), the Court may, *sua sponte*, decline to exercise supplemental jurisdiction over pendant issues"), *amended in part sub nom. Amaechi v. Univ. of Kentucky*, No. CIV.A-09-118-KSF, 2010 WL 2559080 (E.D. Ky. June 21, 2010). Therefore, Count II will be dismissed without prejudice.

<u>CONCLUSION</u>

Accordingly, and for the reasons stated herein, the Motions (Doc. Nos. 27, 34) will be **GRANTED**. Plaintiff's federal WARN Act claim in Count I will be dismissed with prejudice for failure to state a claim. Plaintiff's state New Jersey WARN Act claim in Count II will be dismissed

without prejudice based on the Court declining to exercise supplemental jurisdiction over that claim.

An appropriate corresponding order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE